UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JAMES CUTRER                                  CIVIL ACTION

VERSUS

TWT TRANSPORT, L.L.C., ET AL.              NO. 3:18-CV-807-JWD-RLB

## RULING ON MOTION FOR SUMMARY JUDGMENT

Before the Court is *Northland Insurance Company's* ("Northland") *Motion for Summary Judgment*. (Doc. 50.) It is opposed by Plaintiff James Cutrer ("Plaintiff" or "Cutrer") (Doc. 64); defendants Terry Reed ("Reed") and TWT Transport, LLC ("TWT") (collectively "TWT/Reed") (Doc. 67); and intervenor State of Louisiana, Office of Governor, Division of Administration, Office of Risk Management ("Louisiana" or "Intervenor") (Doc. 63), (collectively "Opponents").[1] Northland filed a reply memorandum in support of its motion. (Doc. 68.) The Court has considered the law, the facts in the record, and the arguments and submissions of the parties, and, for the reasons which follow, the motion is granted in part and denied in part.

## I.    BACKGROUND

This case arises out of an accident which occurred on September 25, 2017, near Interstate I-10 westbound in Baton Rouge, Louisiana. (Doc. 36, § IV.) The essential facts surrounding the accident are largely undisputed. (Doc. 50-2 at 1; Doc. 63 at 1-2; Doc. 64 at 2; Doc. 67 at 1-2.) On this date, Plaintiff was working as a member of a sign crew for the Louisiana Department of Transportation and Development ("DOTD") on the shoulder of I-10

---

[1] Also sued but not involved in this motion are two other alleged insurers of TWT/Reed: Penn-Star Insurance Company and State Farm Mutual Automobile Insurance Company. (Doc. 36 ¶ I(d), (e), (f), and (g).)

near the Acadian exit. (Doc. 11, § 7; Doc. 75-7 at 40–42. [2])  At the time of the accident, a 2005/2006 Freightliner tractor ("Freightliner") being driven by Rodney Dillion ("Dillion") was towing a mobile unit westbound on I-10 near where Plaintiff was working. Dillion was employed by TWT. TWT is a limited liability company organized under the laws of Mississippi. (Doc. 50-4 at 10-11; Doc. 63-2; Doc. 64-3.) The mobile unit being towed was an 8' X 20' X 12' box structure attached to a four wheel trailer frame which was originally a "communications building" which Reed had converted to a portable, handicapped mobile bathroom for use by his disabled son, Wesley Reed, who, at the time, was working near Houston, Texas. (Doc. 50-3 at 3-4; Doc. 50-4 at 41–43, 60. *See also* Doc. 75-4, responses 1 and 2.) It is described by Northland as "a handicapped restroom facility on wheels." (Doc. 50-2 at 3). The Court will refer to it as the "mobile bathroom". The Freightliner tractor and the mobile bathroom were owned by Reed individually. (Doc. 50-5; Doc. 50-3 at 3–4; Doc. 50-4 at 17, 36, 41–43.)

Reed and three employees of TWT (Rodney Dillion, Sherry Shaw and Jerome Peterson) were traveling from Mississippi, where Reed lived, to Houston, Texas. Part of TWT's business involved moving manufactured homes for FEMA and others following natural disasters. (Doc. 50-4 at 11–13.) While Northland claims that this trip was purely a personal mission (*see, e.g.*, Doc. 50-1 at 1; Doc. 50-2 at 4 (citing Doc. 50-3 at 3–4; Doc. 50-4 at 41–43, 72–73)), this is contested by the Opponents who point the Court to testimony suggesting that the trip had a dual purpose: to bring the mobile unit to Houston where Reed's son lived, but also, to move manufactured homes in Texas (Doc. 63 at 5-6 (citing Doc. 50-4 at 80–83; Doc. 50-6 at 78–79)).

---

[2] All deposition page references in this and the 30(b)(6) deposition of TWT are to deposition page numbers, not Document page numbers.

Reed had originally intended to use a 2001 International Tractor ("International") to make the trip but was unable to do so because of a broken water pump on the vehicle. (Doc. 50-4 at 61–62.) The International was a covered auto insured under the Northland policy. (Doc. 50-7 at 26.) Because the International was disabled, Reed decided to use the Freightliner, a vehicle owned by him individually. (Doc. 50-4 at 61–62.) The Freightliner was not listed on the policy. (Doc. 50-7 at 26.)

Prior to the accident, Reed and Dillion were in the Freightliner and Shaw and Peterson were in an escort truck accompanying the Freightliner. Dillion took over driving the Freightliner when Reed became ill and left the vehicle near Denham Springs in order to get medical attention. (Doc. 50-4 at 56.) As the Freightliner approached the Acadian Thruway exit, the mobile bathroom detached from the tractor and travelled towards Plaintiff, who was working near the highway, and struck a parked DOTD vehicle. (Doc. 50-4 at 73–74.) Plaintiff was injured when he jumped out of the path of the oncoming mobile bathroom. He now sues for injuries and damages allegedly caused by the accident and the fault of Reed, Dillion and TWT. (Doc. 36.) The State intervened to recover worker's compensation benefits paid to and on behalf of Plaintiff as well as for property damage sustained by its damaged vehicle. (Docs. 11 and 59.)

Specifically, Plaintiff alleges that the Freightliner was negligently operated by Dillion and, in addition, that Reed was negligent in attaching and securing the mobile bathroom to the Freightliner; in negligently hiring, training and supervising Dillion; and in negligently entrusting the vehicle to him. (Doc. 36 ¶¶ V, VI, XI and XIV. *See also* Doc. 50-2 at 3.) Louisiana, as Plaintiff's employer, provided workers' compensation benefits to and on behalf of Plaintiff and has intervened to recover same.

3

TWT is a limited liability company incorporated in Mississippi. (Docs. 60-3 and 63-2.) Its members are Tammy Ladner and Terry Reed. (*Id.*) Northland's commercial automobile liability insurance policy at issue ("Policy") is found at Doc. 50-7 at 3–74. The named insured is "TWT Transport; Terry Reed and Tammy Ladner DBA." (Doc. 50-7 at 4, 9, 24, 26.) The policy lists the "Legal Entity" of the named insured as "Individual". (Doc. 50-7 at 24.) The Policy's Schedule of Automobiles" lists a "2001 International Tractor and any non-owned trailer while attached to a scheduled power unit." (Doc. 50-7 at 26; *see also* Doc. 50-2 at 4-5) The policy does not list or mention the Freightliner.

Northland moves for summary judgment arguing that the Policy did not provide coverage to TWT or Reed at the time of the accident because, it maintains, neither the Freightliner nor the mobile bathroom were insured under the policy. (Doc. 50 at 1-2.)

The policy included a MCS-90 endorsement wherein Northland agreed to pay any final judgment "recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Act of 1980 regardless of whether or not . . . such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." (Doc. 50-2 at 5 n.24)

The Policy also covers "[a]ny 'auto'" you do not own while used with the permission of the owner as a temporary substitute for a covered 'auto' that is out of service because of its: a. Breakdown…" (Doc 68 at 2 n.2 (citing Doc. 50-7 at 29).) The Northland policy also extends covered auto status to "any trailers you don't own while attached to" any specifically described power unit (Doc. 68 at 5 n.9 (citing Doc. 50-7 at 28, Symbol 67))[3] and "trailers with a load

---

[3] Page references to the insurance policy are to record document page numbers, not the internal policy page numbers.

capacity of 2000 pounds or less designed primarily for travel on public roads." (*id.* at n.10 (citing to Doc. 50-7 at 29).) "Auto" is defined as a "land motor vehicle, 'trailer' or semitrailer designed for travel on public roads" and "trailer" as "a semitrailer or a dolly used to convert a semitrailer into a trailer." (*id.* at n.11 (citing Doc. 50-7 at 39 and 41).) "Auto" does not include "mobile equipment" (*id.* at n. 12 (citing Doc. 50-7 at 39)) which includes "any of the following types of land vehicles, including any attached machinery or equipment:

> 1.  Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads; . . .
>
> 6.  Vehicles not described in Paragraphs 1., 2., 3. or 4. above maintained primarily for purposes other than transportation of persons or cargo. . . ."

(*id.* at n.13 (citing Doc. 50-7 at 40-41)).

Although "mobile equipment" is excluded from the definition of "auto", another part of the Policy provides:

> If Liability Coverage is provided by this coverage form, the following types of vehicles are also covered 'autos' for Liability Coverage: . . .
>
> 2.  "Mobile equipment" while being carried or towed by a covered "auto".

(Doc. 50-7 at 29.)

## II.    SUMMARY OF ARGUMENTS OF THE PARTIES

Northland advances three main reasons why it does not provide coverage for the subject accident. First, it maintains that "neither the 2005/2006 Freightliner nor the mobile unit were specifically described vehicles as required to be 'covered autos' under the Policy." (Doc. 50 at 1-2; Doc 50-2 at 6-7.) Nor does the mobile bathroom unit qualify for coverage as a trailer under the terms of the policy. (Doc. 50-2 at 5–7.)

5

Second, "although the Policy includes an MCS-90 endorsement that provides indemnification for a judgment against Northland's named insured under certain circumstances regardless of whether or not the motor vehicle is specifically described in the policy, the MCS-90 endorsement does not apply here, argues Northland, because the Freightliner was not being used in a for-hire capacity at the time of the incident." (Doc. 50 at 2; *see also* Doc. 50-2 at 8–10.)

Third, in its reply brief, Northland contends that the Policy did not provide coverage on the Freightliner as a temporary substitute automobile, as agued by Opponents, because case law interpreting this kind of coverage holds that when the policy is issued to an individual doing business as a company, a vehicle owned by the sole proprietor cannot qualify as a temporary substitute auto under the policy as a matter of law. (Doc. 68 at 2 (case citations omitted); *see also id.* at 2-4.) Here the named insureds are Reed and Ladner DBA.

None of the Opponents disagree with Northland's contention that the Freightliner was not listed on the Policy's schedule of covered vehicles as a "Specifically Described Auto[ ]", nor could they. (*See* Doc. 50-7 at 26.) Rather, Intervenor argues first, that the MCS-90 Endorsement provides coverage to "for-hire carriers operating motor vehicles transporting property in interstate or foreign commerce" and TWT was precisely that since, at the time of the accident, Reed was acting, in part at least, "as co-owner and member of TWT Transport, on behalf of the business, to go to Texas with his employees to prepare to move manufactured homes." (Doc. 63 at 11–12; *see also id.* at 11–15) At the very least, there is a question of fact as to Reed's motives in traveling to Texas which fact issue should preclude a summary judgment. (*Id.*) The other two Opponents make similar arguments (Doc. 67 at 7–9; Doc. 64 at 5–6).

In addition, Opponents argue that coverage was provided since the Freightliner was acting as a temporary substitute auto at the time of the accident (Doc. 63 at 9–12; Doc. 67 at 4–7; Doc. 64 at 5 (citing Doc. 50-7 at 29).) This is because, argue Opponents, coverage is provided for "any auto that that 'you' do not own while its being used with its owner's permission as a temporary substitute for a covered auto that is out of service due [to] its breakdown, repair, servicing, loss or destruction." (Doc. 67 at 5 (citing Doc. 50-7 at 29).) Here, there is no serious dispute that the 2001 International tractor covered under the policy had suffered a leaking water pump and could not be used, requiring the Freightliner, owned not by TWT, but by Terry Reed individually, to be used in its place. (Doc. 63 at 8 (citing Doc. 50-4 at 16–17).) Opponents thus contend that the Freightliner meets the definition of a temporary substitute vehicle and coverage follows.

Further, Opponents contend that the mobile bathroom unit was a "trailer" or "mobile equipment" not owned by the insured and therefore covered as a "auto" since it is "mobile equipment" under the terms of the policy. (Doc. 63 at 9–11; Doc. 67 at 5–7 (citing Doc. 50-7 at 26).) "[I]f liability coverage is provided for under the terms of the Northland Policy, it would also provide coverage for mobile equipment while that equipment [was] being towed by a covered auto." (Doc. 67 at 5 (citing Doc. 50-7 at 29); *see also* Doc. 63 at 8–9, Doc. 64 at 5.) Intervenor and TWT/Reed maintain that any ambiguities in the policy language should be construed against Northland and in favor of coverage. (Doc. 63 at 15; Doc. 67 at 9–10.)

In its reply, Northland argues that this Court is bound to apply federal Fifth Circuit precedent and, under same, the MCS-90 endorsement does not provide coverage since "the Freightliner was not being used in a for-hire capacity". (Doc. 68 at 1; *see also id.* at 7–10.) Nor was the Freightliner a temporary substitute auto because under Louisiana jurisprudence, when a

policy is issued to an individual doing business as a company (which Northland argues is the case here), "a vehicle owned by the sole proprietor [can] not qualify as a temporary substitute auto under the policy as a matter of law." (Doc. 68 at 2 (case citations omitted); *see also id.* at 2–4.) Finally, the mobile bathroom meets the definition of "mobile equipment" and therefore must qualify as an "auto" in order for coverage to apply. Because it does not, it "does not qualify for coverage under the Policy on its own." (Doc. 68 at 5. *See also id.* at 5–7.)

## III.    STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.   DISCUSSION

### A. Issues to be Decided

There are three main issues the Court must decide. First, might the MCS-90 endorsement provide coverage because there is a fact issue regarding whether, at the time of the accident, TWT was acting as a for-hire carrier operating the Freightliner transporting property in interstate or foreign commerce? Second, is there an issue of fact regarding whether the Freightliner was being used as a temporary substitute vehicle at the time of the accident? Finally, is there coverage because the mobile bathroom was being towed at the time of the accident?

### B. Does the MCS-90 Endorsement Provide Coverage?

Northland issued an MCS-90 Form with the policy which reads, in pertinent part, as follows:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Section 29 and 30 of the Motor Carrier Act of 1980 and the rules and regulations of the Federal Motor Carrier Safety Administration (FMCSA).
>
> In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirement of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.

(Doc. 50-7 at 43.)

The MCS-90 Form is a federally mandated policy endorsement required to ensure a motor carrier's compliance with federal minimum levels of financial responsibility for the transportation of property by a motor carrier within the United States. *Canal Ins. Co. v.*

9

*Coleman*, 625 F.3d 244 (5th Cir. 2010). Whether the MCS-90 endorsement covers a given accident is a matter of federal law. *Id*. at 247.

> The purpose of the MCS–90 endorsement is to "assure compliance" with federal minimum levels of financial responsibility for motor carriers. See 49 C.F.R. § 387.15 illus. 1. The MCS–90 endorsement must be attached to any liability policy issued to for-hire motor carriers operating motor vehicles transporting property in interstate commerce. See 49 C.F.R. §§ 387.3, 387.7. The endorsement creates a suretyship, which obligates an insurer to pay certain judgments against the insured arising from interstate commerce activities, even though the insurance contract would have otherwise excluded coverage. *Minter v. Great Am. Ins. Co. of N.Y.*, 423 F.3d 460, 470 (5th Cir.2005).

*Id.*

All parties seem to agree that, in order for the MCS-90 endorsement to apply, the Freightliner must have been used to transport property in interstate commerce in a "for-hire" capacity, i.e. transporting, for compensation, the goods or property of another. (*See, e.g*., Doc. 50-2 at 8; Doc. 68 at 8–9; Doc. 63 at 13; Doc. 67 at 7). On this point, the Court agrees as well. *See* 49 C.F.R. § 387.5 ("For-hire carriage means the business of transporting, for compensation, the goods or property of another."). Where the parties disagree is first, whether MCS-90 coverage requires that the Freightliner be transporting a third party's property in a for-hire capacity at the time of the accident and second, whether TWT/Reed's "mixed motive" for making the trip to Texas raises a material issue of fact on this question.

On the first point, Northland points the Court to *Canal Ins. Co. v. Coleman, supra*, where, acknowledging a split in the circuits, the Fifth Circuit adopted what it perceived to be the majority approach and held that the "MCS-90 does not cover vehicles when they are not presently transporting property in interstate commerce." 625 F.3d at 251. Or, stated another way, MCS-90's applicability is determined "with reference to [the] time of the loss." *Id*. at 250. This is sometimes called the "trip-specific" approach. *Id.* at 253.

TWT/Reed and Intervenor emphasize that "not all courts have used a trip specific approach" (Doc. 63 at 13) and urge this Court to follow a broader approach that would call for the application of MCS-90 when a member of the public is injured by a licensed carrier using a vehicle used to transport goods pursuant to an ICC certificate, even if the vehicle was not transporting the property of a third party, for compensation, at the time of the loss. (Doc. 63 at 13-15 (citing *Canal Ins. Co. v. YMV Transport, Inc*., 867 F. Supp. 2d 1099 (W.D. Wash. 2011); *John Deere Ins. Co. v. Nueva*, 229 F.3d 853 (9th Cir. 2000); Doc. 67 at 8 (citing same cases).)

However, as Northland correctly points out in its reply, this Court is not free to choose the interpretation it favors; it is bound to follow clear Fifth Circuit precedent. (Doc. 68 at 8 (citing this Court's decision of *June Med. Services, LLC v. Kliebert*, 105 F. Supp. 3d 611, 624 M.D. La. 2015).) Here, *Canal Ins. Co. v. Coleman* is clear and continues to be followed. *See, e.g.*, *Pace v. Travelers Indem. Co. of America*, No. 09-7047, 2010 WL 5141252 at * 2 (E.D. La. Dec. 9, 2010); *Jackson v. Wise*, 17-1062 (La. App. 1st Cir. 2018); 249 So. 3d 845, 852  (dicta); *Lopez v. Manint*, 11-101 (La. App. 5th Cir. 2011); 76 So. 3d 1223, 1227; *Newman v. State Farm Mut. Auto. Ins. Co*., 10-1384 (La. App. 3d Cir. 2011); 62 So. 3d 808, 812. It will be followed by this Court.

Opponents next argue that there is a question of fact regarding whether the mission being pursued at the time of the accident was a personal one or one with "mixed motives", i.e. business as well as personal. (Doc. 63 at 6–7, 12–13; Doc. 64 at 5–6; Doc. 67 at 8–9). They emphasize Dillion was being paid a per diem and meals while driving the Freightliner. (Doc. 63 at 12; Doc. 67 at 6) Therefore, "[a]t the very least, this creates a genuine issue of fact as to if the 2005/06 Freightliner was being used in a for-hire capacity at the time of the accident." (Doc. 67 at 8.) Northland disputes that the per diem and meals amounted to pay (Doc. 68 at 9), but

11

argues, even if he was paid, "it would not affect the outcome here as the material issue for the MCS-90 is whether the named insured was engaged in the interstate transportation of goods or property for others for compensation" (*id*.).

There are facts in the record indicating that TWT and Reed had a business motive to travel to Texas, i.e. "to move and set up mobile/manufactured homes as part of the business of TWT Transport." (Doc. 63 at 7 (citing Doc. 50-6 at 78–79 and Doc 50-4 at 38–41, 42, 52–53, 80–83, 85–86; Doc. 50-6 at 45, 55–56, 78–79); Doc. 67 at 6 (citing some of the same deposition testimony).) Reed was a storm chaser, and he and his companions hoped to get work in Texas following Hurricane Harvey in 2017 (Doc. 50-4 at 42).

But this testimony does not address the main fact question informing the applicability of the MCS-90 endorsement under the Fifth Circuit test: at the time of the accident, was the Freightliner being used for-hire (i.e. was TWT being paid) to transport the property of a third party in interstate commerce. Here, the record evidence provides a single answer: no. TWT and Reed were not under any contract for work on the date of the accident. (Doc. 50-3, answer to interrogatory 6; Doc. 50-4 at 52–53.) The only property being moved was the mobile bathroom which belonged to Reed; it was being moved for the use of his son; and neither Reed not TWT received any compensation from a third party to transport it. (Doc. 50-3, answers to interrogatories 6 and 7; Doc. 50-4 at 84.) Even if you consider the meals and per diem Dillion received as payment for driving and for moving the mobile bathroom, that payment was by TWT, not a third party. For these reasons, the MCS-90 endorsement does not apply, and Northland is entitled to summary judgment on this issue.

C.  *Was the Freightliner a Temporary Substitute Vehicle?*

Unlike the interpretation of the MCS-90 endorsement, because jurisdiction is based on the diversity of citizenship of the parties, the remaining issues (whether the Freightliner and the mobile bathroom are covered under other parts of the Policy), are governed by state law. However, none of the parties addressed the issue of which state law governs.[4] As stated by the Fifth Circuit:

> In a diversity action, this Court applies state substantive law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In deciding which state's substantive law governs a dispute, we apply the choice-of-law rules of the state in which the action was filed, in this case, Louisiana. *See Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Smith v. Waste Mgmt., Inc.*, 407 F.3d 381, 384 (5th Cir.2005).

*Abraham v. State Farm Mut. Auto. Ins. Co*., 465 F.3d 609, 611 (5th Cir. 2006)

In *Champagne v. Ward,* the Louisiana Supreme Court set out the choice-of-law framework to be applied in cases involving parties and insurance policies of different states. *Champagne v. Ward*, 03-3211 (La. 1/14/05); 893 So. 2d 773. "In applying the *Champagne* analysis, the court is to first determine whether the provisions of each state's applicable law differ." *Greene v. Zurich Am. Ins. Co*., No. 6:19-CV-00018, 2019 WL 5390632, at *3 (W.D. La. Aug. 7, 2019), *report and recommendation adopted*, No. 6:19-CV-00018, 2019 WL 5390105 (W.D. La. Oct. 21, 2019). *See also Abraham*, 465 F.3d at 611 ("At the outset, *Champagne* instructs us to consider the language of the UM laws from each involved state to determine if the relevant provisions differ.")

If the laws of the competing states are different, the Fifth Circuit in *Abraham* explained how the choice of law issue is to be resolved under Louisiana' conflicts of laws code.

---

[4] In its reply brief, Northland points mostly to Louisiana law but also references Mississippi cases. However, it does not address the issue of which is controlling. (Doc. 68.)

The Louisiana choice-of-law rules applicable here are found in Louisiana Civil Code Annotated articles 3515 and 3537. Article 3515 states that when a case involves contacts with other states, the applicable law is that "of the state whose policies would be most seriously impaired if its law were not applied to that issue." LA. CIV.CODE ANN. Art. 3515. The factors used to determine the state whose policies would be most impaired are:

> (1) the relationship of each state to the parties and the dispute; and

> (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

*Id*.; see also *Dunlap v. Hartford Ins. Co*., 907 So.2d 122, 124 (La. Ct. App. 1st Cir. 2005).

Article 3537, intended to be read in conjunction with article 3515, provides "an illustrative list of the factual contacts that are usually pertinent" in determining which state's policies would be most impaired by the failure to apply its law. La. Civ. Code Ann. art. 3537 cmt. c. Article 3537 additionally requires us to evaluat[e] the strength and pertinence of the relevant policies . . .  in the light of:

> (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties;

> (2) the nature, type, and purpose of the contract; and

> (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

*Id*. art. 3537.

The first step in determining which state's law applies under these sections is to identify the policies involved for each state. Id. cmt. d.

*Abraham*, 465 F.3d at 611–12 (5th Cir. 2006)

In this case, the Court need not engage in an analysis of the competing factors, contacts,

policies and interests of the two states since the law of Mississippi and Louisiana on the critical

issues is the same. *See, e.g. Fortenberry v. Prine*, No. 2:14-CV-56-KS-MTP, 2014 WL

4963364, at *1 (S.D. Miss. Oct. 3, 2014) ("No Mississippi court has considered the meaning of

the term "temporary substitute" in an insurance policy, but both this Court and the Fifth Circuit

have looked to law from other jurisdictions to define the term." (citations omitted.)); *Canal Ins.*

*Co. v. Herrington*, 846 F. Supp. 2d 654, 659 (S.D. Miss. 2012) (citing Louisiana case law on the

issue of sole proprietorship within the context of a temporary substitute automobile issue.)

Opponents argue that the Freightliner was a temporary substitute vehicle and therefore

covered under the Policy. The named insured in the Policy is "TWT Transport; Terry Reed and

Tammy Ladner DBA." (Doc. 50-7 at 24.). The Policy's temporary substitute auto provision,

states in pertinent part:

> If Liability Coverage is provided by this coverage form, the following types of
> vehicles are also covered "autos" for Liability Coverage:…
>
> 3. Any "auto" you do not own while used with the permission of the owner as a
>    temporary substitute for a covered "auto" you own that is out of service
>    because of its:
>
>    a. Breakdown…

(Doc. 50-7 at 29.)

Opponents' argument is simple and sensical. The insured vehicle, the 2001 International,

"broke down" when its water pump malfunctioned, and this vehicle could not be used. Thus,

TWT used the Freightliner to make the trip to Texas, which trip was intended, in part at least, to

serve the business of TWT. The Freightliner was not owned by TWT, an LLC, which is a

separate juridical entity from Reed, who did own the Freightliner. Therefore, the Freightliner

was, consistent with the plain and unambiguous language of the policy, a temporary substitute

auto covered under the policy. (Doc. 63 at 7–11; Doc. 64 at 4–6; Doc. 67 at 4–7.)

Northland counters, however, that while TWT may be considered a separate juridical entity from Reed for some purposes, the case law in both Louisiana and Mississippi is clear that when, as here, the policy is issued to an individual (in this case, Reed) "doing business as" a named business (i.e. a sole proprietorship), a vehicle owned by the individual cannot qualify as a temporary substitute auto. (Doc. 68 at 2–3 (citing, *inter alia, Robinson v. Heard*, 01-1697 (La. 2/26/02); 809 So. 2d 943, 946; *Canal Ins. Co. v. Harrington*, 846 F. Supp. 2d 654, 658-59 (S.D. Miss. 2012).) Northland details that the Policy was issued to "TWT Transport; Terry Reed and Tammy Ladner DBA" and Legal Entity is listed as "Individual." (Doc. 50-7 at 24.)

The problem with Northland's argument is that, in the cases it cites to support its position, the alleged temporary substitute vehicle was owned by either by the individual directly or a sole proprietorship which, under the cited cases, is considered the same as the individual. *See Robinson*, 809 So.2d at 946; *Shafer v. Langston*, 311 So.2d 63, 65 (La. App. 2d Cir. 1975); *Hebert v. Armstead*, 227 So. 2d 636, 639 (La. App. 3d Cir. 1969); *Mahaffey v. State Farm Mut. Auto Ins. Co.*, 175 So. 2d 905, 908 (La. App. 3d Cir. 1965); *Canal Ins. Co. v. Herrington*, 846 F. Supp. 2d 654, 658-50 (S.D. Miss. 2012). Here TWT, the owner of the covered auto, was neither an individual nor a sole proprietorship but was an LLC, clearly a separate legal entity from Reed, the owner of the Freightliner. (*See e.g.*, Doc. 50-6 at 42–44 and Ex. 10, annual report). That an LLC is considered a separate juridical entity from its owners is a principle supported by both Mississippi and Louisiana law. La. Civ. Code art. 24; *Martin v. Spring Break 83 Production, LLC*, 797 F. Supp. 2d 719, 724 (E.D. La. 2011), *aff'd*, 688 F.3d 247 (5th Cir. 2012); *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 977 (Miss. 2007).

Therefore, regardless of how the named insured was listed on the Policy, it was a commercial policy intended to cover a vehicle (the International) which was owned by the LLC,

a separate juridical entity from Reed, the individual who owned the Freightliner. Stated another way, the covered auto was owned by a separate entity than that which owned the Freightliner therefore qualifying the Freightliner as a temporary substitute vehicle.

Both Mississippi and Louisiana law support this conclusion. In *Caldwell v. Hartford Acc. and Indem. Co.*, 248 Miss. 767, 160 So. 2d 209 (1964), the Mississippi Supreme Court held that a wife's automobile was a 'temporary substitute automobile' within the provisions of the husband's policy, although the named insured was the husband but also included his spouse when a resident of the same household. For purposes of the temporary substitute clause, the car was not owned by the husband nor by him and his wife jointly, but only by the wife, and, according to the terms of the policy, it was 'not owed by the named insured' and was therefore covered as a temporary substitute automobile. The Court relied in part on *St. Paul-Mercury Indemnity Company v. Heflin, D.C.*, 137 F. Supp. 520 (W.D. Ark. 1956). *Caldwell*, 248 Miss. at 775, 160 So. 2d at 212. In *Heflin*, the court found temporary substitute vehicle coverage on a policy written to the insured individually when he was involved in an accident while driving a vehicle belonging to a partnership of which he was a partner. *Heflin*, 137 F. Supp. at 524.

While not precisely on point, the Court finds *Yagel v. Sanders*, 36,101 (La. App. 2d Cir. 7/17/02); 823 So. 2d 448, consistent with *Caldwell* and persuasive on the issue of the temporary substitute status of the Freightliner. In *Yagel*, the defendant Stanley Sanders was driving on a highway in his personal vehicle, a 1978 Chevrolet pickup truck.

> Mr. Sanders was the president and sole shareholder of SAD, Inc.; this company hauled such heavy items as railroad parts and lumber on flatbed trailers. After a job was canceled earlier that day, he decided to repair some broken boards in the bed of the 1989 Lufkin flatbed trailer which he owned but leased to SAD, Inc. He purchased several pieces of lumber from Lufkin Industries in Bossier City and put them in the bed of his personal pickup. One end of the lumber was placed in the bed near the tailgate, so that the other end rested over the top of the cab. That end was then secured to a headache rack at the front of the truck bed. However, as Mr.

17

Sanders drove on the interstate, the lumber came loose and shifted. As the Sanders truck passed [plaintiff] Mr. Yagel, [who was standing on the side of the road], one or more loose boards struck him in the face, inflicting severe injuries.

*Id.* at 450.

A policy issued by United Southern Assurance Company ("USAC") covered the 1989 Lufkin flatbed trailer, a 1988 International tractor truck, and "temporary substitute autos." The plaintiffs maintained that Mr. Sanders' personal pickup truck qualified as a "temporary substitute auto" since it was being used to haul lumber for the repair of the flatbed trailer. USAC and the plaintiffs filed cross motions for summary judgment on the issue of coverage. The district court granted USAC's motion, but that ruling was reversed by the court of appeal, *Yagel v. Sanders*, 27,276 (La. App. 2d Cir. 8/23/95); 659 So.2d 859 (unpublished), and the matter proceeded to trial. Following a verdict in favor of the plaintiff, The Louisiana Insurance Guarantee Association ("LIGA") who substituted for the insolvent USAC, appealed the coverage ruling.

Significantly, in finding that Sander's personal vehicle was a temporary substitute vehicle for the Lufkin flatbed trailer (which he also personally owned but which was leased to the corporation), the court distinguished *Robinson v. Heard*, the primary case relied upon by Northland.

> LIGA argues that Mr. Sanders' position as president and sole shareholder of SAD, Inc., caused him to take on a "dual identity" and become the named insured, consequently preventing the application of the substitute auto provisions. However, SAD, Inc. was a corporation. A corporation is a juridical person; the personality of a juridical person is distinct from that of its members. La. C.C. art. 24. *See Robinson v. Heard*, 2001–1697 (La. 2/26/02), 809 So. 2d 943, which dealt with application of a temporary substitute auto provision when the named insured was a sole proprietorship, not a corporation.

*Id.* at 453.

Here, like in *Yagel*, Reed was the owner of the alleged temporary substitute vehicle and a separate juridical entity, TWT, was the owner of the insured vehicle. And while the Northland policy was issued to "TWT Transport; Terry Reed and Tammy Ladner" and the insured is listed as an "individual" entity, it is a commercial policy and it is undisputed that TWT is an LLC and that the International, the insured vehicle, is owned by the LLC. At the very least, this raises an ambiguity in the policy which requires the Court to construe the policy against the insurer who drafted the policy and in favor of coverage, a well-established principle under both Mississippi and Louisiana law. *See, e.g.* *Caldwell*, 248 Miss. at 776-77, 160 So. 2d at 212–13; La. Civ. Code art. 2056; *In re Katrina Canal Breaches Litigation*, 495 F.3d 191, 207 (5th Cir. 2007); *Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 671 (M.D. La. 2019) (deGravelles, J.).

This principle of construction, applied specifically to the issue at hand, also appears to reflect the position of one noted treatise on insurance law.

> Where there is an ambiguity in a policy issued to a business as to whether the "named insured" includes the business entrepreneur individually, "named insured" will be construed as meaning the business only, so that vehicle owned by entrepreneur individually and used as substitute for company vehicle which was inoperative, will not be deemed as "owned by the named insured," and is not barred from coverage as a "temporary substitute automobile."

8A Steven Plitt, et al., *Couch on Insurance* § 117:99 (3d ed. 2020) (but noting other courts disagree when the insured is a DBA).

The Court again emphasizes that the owner of the insured vehicle insured by the Policy, TWT, was an LLC and not a "DBA" or sole proprietorship.

Northland makes the additional argument that "[t]he Freightliner also cannot be considered a 'temporary substitute' for the scheduled auto because it was not being used in the same capacity as the insured vehicle," i.e. it was being used for a personal mission. (Doc. 68 at

4 n.8.) The Court disagrees since, as is discussed elsewhere in this ruling, there is clearly an

issue of material fact regarding whether the trip being undertaken by Reed, Dillion and the

others was, at least in part, pursuing TWT's business.

In conclusion, the Court finds that summary judgment is not appropriate on the issue of

coverage of the Freightliner as a temporary substitute vehicle.

### D. Is There Coverage for the Mobile Bathroom?

Opponents contend that the mobile bathroom was a "trailer" or "mobile equipment" not

owned by the insured and therefore covered as an "auto" under the terms of the policy. (Doc. 63

at 9-11; Doc. 67 at 5-7 (citing Doc. 50-7 at 26).) "[I]f liability coverage is provided for under

the terms of the Northland Policy, it would also provide for coverage for mobile equipment

while that equipment was being towed by a covered auto." (Doc. 67 at 5 (citing Doc. 50-7 at 29;

*see also* Doc. 63 at 8–9; Doc. 64 at 5).) Northland responds that the mobile bathroom meets the

definition of "mobile equipment" and therefore it must qualify as an "auto" in order for

coverage to apply. Because "mechanical equipment" is excluded from the definition of "auto,"

it "does not qualify for coverage under the Policy on its own." (Doc. 68 at 5–7.)

The mobile bathroom was an 8 x 20 x 12 communications trailer which had been

converted by Reed to be a handicapped bathroom for Reed's son. (Doc. 50-4 at 42, 60.) A

double door and ramp had been installed to allow wheelchair accessibility for use by Reed's son

while he was working in Texas. (*Id*. at 42, 60-61.) It already had a trailer hitch (*id*. at 59), four

wheels, and could be pulled down public roads (*id*. at 42). It was not self-propelled. (*Id*.)

The Northland policy extends covered auto status to "any trailers you don't own while

attached to" any specifically described power unit (Doc. 50-7 at 28, Symbol 67) and "trailers

with a load capacity of 2000 pounds or less designed primarily for travel on public roads."

(Doc. 50-7 at 29.) "Auto" is defined as a "land motor vehicle, 'trailer' or semitrailer designed for travel on public roads" and "trailer" as "a semitrailer or a dolly used to convert a semitrailer into a trailer." (Doc. 50-7 at 39 and 41.) "Auto" does not include "mobile equipment" (Doc. 50-7 at 39) which includes "any of the following types of land vehicles, including any attached machinery or equipment:

> 4.  Bulldozers, farm machinery, forklifts and *other vehicles designed for use principally off public roads*; . . .
>
> 6.  Vehicles not described in Paragraphs 1., 2., 3. or 4. above *maintained primarily for purposes other than transportation of persons or cargo*. . . ."

(Doc. 50-7 at 40–41) (emphasis added.)

Here, Opponents are correct that the mobile bathroom is a trailer and therefore might otherwise fall within the definition of a covered auto. But Northland is right that the mobile bathroom, by the uncontradicted testimony of Reed in TWT's 30(b)(6) deposition, was built and maintained primarily for purposes other than transportation of persons or cargo and was designed principally for use off public roads, i.e. for use as a handicap restroom for Reed's son while he worked in Texas. (Doc. 50-4 at 42, 60–61.) Thus "mobile equipment" is excluded from the definition of "auto". *Zoller v. Zurich Am. Ins. Co*., No. 16-CV-1837, 2018 WL 6494703 at *8 (E.D. La. Dec. 10, 2018), *aff'd sub nom. Zoller v. T.H.E. Ins. Co*., 783 F. App'x 387 (5th Cir 2019) (unpublished).

But Opponents are right that mobile equipment is specifically covered while being towed by a covered auto. (Doc. 67 at 5.) Although "mobile equipment" is excluded from the definition of "auto", another part of the Policy provides:

If Liability Coverage is provided by this coverage form, the following types of vehicles are also covered 'autos' for Liability Coverage: . . .

2.  "Mobile equipment" while being carried or towed by a covered "auto".

(Doc. 50-7 at 29.)

As this Court has already held, there is at least a question of fact as to whether the Freightliner was a temporary substitute auto and therefore a covered auto at the time of the accident. Therefore, even though the mobile bathroom is "mobile equipment" as defined in the Policy, it would appear that it is nonetheless covered under this provision of the Policy. Accordingly, Northland's motion is denied on this issue.

## V.      CONCLUSION

For the foregoing reasons, *Northland Insurance Company's Motion for Summary Judgment* (Doc. 50) is **GRANTED IN PART** in that the Policy does not provide coverage through the MCS-90 endorsement. In all other respects, the *Motion for Summary Judgment* is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>September 9, 2020</u>.


_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

22